DECISION
Before this Court for decision after a bench trial are Plaintiffs' Count I, breach of fiduciary duty, and Count IV, determination and payment of the fair value of Plaintiffs' ownership interests in Billington Farms LLC (the LLC). These claims arise from "the acquisition of undeveloped property, the organization of a limited liability company, and subsequent disagreements that arose among the members of the company." Marsh v. Billington Farms, LLC, 2006 R.I. Super. LEXIS 119 (Aug. 31, 2006) (denying cross motions for summary judgment on the breach of fiduciary duty claim).
 I Facts and Travel
The individuals involved in this litigation are two married couples which each own two construction-related businesses. Plaintiffs Peter and Anne Marsh are the principal owners of Marsh Builders, Inc. (MBI), a corporation that builds residential homes. Defendant Jackson Despres is the sole shareholder of Smithfield Peat Company (SPC). (Tr. 654.) SPC is a contractor that focuses on building roads for subdivisions. *Page 2 
(Tr. 360.) Nanci Despres, the wife of Jackson Despres, is involved with the operation of SPC but is not an owner.[1]
The two couples and two corporations united together around September 2000 to purchase a large tract of land in Cumberland, Rhode Island and to develop that land into individual lots suitable for single family homes. (Tr. 22-24.) The land was subdivided, received the necessary permits, and eventually became known as the "Longbrook" subdivision. Originally, the individuals planned only to subdivide and sell the unimproved lots. At some point in 2002, however, they decided to construct and sell completed homes. (Tr. 24-26.) Therefore, they entered into an operating agreement in November 2002 to form the LLC and transferred the land to the LLC. (Pl's Ex. 3.) Each of the four individuals — the two Marshes, and the two Despres — became 25% owners of the LLC. Despres was designated as the Manager of the LLC.See Pl's Ex. 3, Art. 1.03; G.L. 1956 § 7-16-15(a) (providing for the designation of one or more "managers" responsible for managing the business and affairs of a limited liability company).
On the valuation date, the land was the primary asset of the LLC; it had no employees or equipment. Therefore, in order to develop the land, the LLC entered into two contracts: a contract with SPC for building of roads and related work, and a contract with MBI for actual construction of the homes. The road-building contract with SPC was a fixed price contract which required SPC to cut trees, install drainage and retention basins, pave roads, and perform other related tasks in exchange for $1.24 million. (Pl's Ex. 4.) The home-building contract provided that MBI would build the homes in exchange for "a total price to be agreed upon" between the LLC and MBI. (Pl's Ex. 5.) The LLC also obtained multiple loans from Citizens Bank (Citizens) in order to finance *Page 3 
road-building, home construction, and other business needs. Those loans were personally guaranteed by Peter Marsh and Jackson Despres. (Pl's Ex. 2.)
By agreement, certain claims in this case have been decided by arbitration. The arbitrator noted that "the difficulty in this case lies, in large measure, in the contractual documents executed by the parties" because those documents did not anticipate the problems that eventually arose. (Arbitration Award 1, Pl's Ex. 10.) As a result, each party "committed significant time and resources to the project, and neither wishes to take a substantial financial hit. . . ."Id. at 2. This Court now must finish the task of dividing the benefits and burdens arising from the LLC.
The first dispute which is relevant to these proceedings arose when SPC's road-building costs exceeded the contract price by a substantial amount. See Arbitrator's Award 6 (noting that SPC sought approximately $655,000 above the contract price in reimbursement for unexpectedly high out-of-pocket costs). Despres sought payment from the LLC to compensate SPC for the additional costs, but was unsuccessful in persuading the Marshes to agree to additional payments. The Arbitrator found that, because the contract was a fixed-price contract, SPC was not entitled to payment for its excess costs. Id. at 10.
An additional dispute involved the home construction contract. As noted above, the contract provides for payment of a price "to be agreed upon." (Pl's Ex. 5.) The parties could not agree, however. Despres took the position that MBI was only entitled to compensation for direct costs of materials and subcontractors, plus an allowance for time expended by the Marshes. The Marshes, however, sought to include a "builder's fee" for their work in addition to direct costs. For example, MBI was paid a builder's fee for Lot *Page 4 
21 which was calculated as ten percent of the difference between $644,453 (the sale price of the finished home) and $175,000 (an estimate of the undeveloped land value). (Tr. 56:6, 58:17-61:4.) Based upon prevailing market rates in the building industry, the Arbitrator eventually calculated a reasonable builder's fee of $340,151 for MBI's work in constructing or partially constructing eight homes. (Arbitrator's Award 24.)
In addition to performing the work provided by the road contract, SPC also performed site-preparation work on the individual lots to make the lots buildable. Despres sought compensation for this work on behalf of SPC, but the parties disputed whether SPC was so entitled. The Arbitrator eventually awarded SPC a reasonable fee for the site work expenses, finding that such services were not included in the road-building contract. Id. at 34.
The parties had various other disputes about the allocation of costs to build the subdivision. The unresolved disputes strained the relationship between the members of the LLC. On March 15, 2004, these disputes reached a boiling point, and Despres requested that the Marshes meet with him. At this meeting, he distributed a memorandum entitled "Random Thoughts" which outlined his complaints with the Marshes. (Pl's Ex. 16.)
On April 23, 2004, the Marshes requested through their counsel that Jackson Despres refrain from issuing any more checks from the LLC's accounts without their approval. (Def's Ex. D.) On May 5, 2004, Despres — on behalf of SPC — caused a Notice of Intention to be filed in the land registry of the Town of Cumberland pursuant to the mechanic's lien laws. See G.L. 1956 § 34-28-1 to 37. Despres knew that the existence of a mechanic's lien on the property was an event of default under the financing *Page 5 
agreements with Citizens, and that MBI would have difficulty constructing the homes without that financing. (Tr. 660-61.) On May 27, 2004, Despres terminated the home-building contract between the LLC and MBI. (Pl's Ex. 22; Arbitration Award 24-25.) Shortly thereafter, the mechanic's lien having not been cured, Citizens terminated the financing arrangements and swept the LLC's accounts. (Pl's Ex. 25, 26.)
On June 11, 2004, the Marshes filed a four-count complaint, personally and on behalf of MBI, against Jackson Despres, Nanci Despres, and SPC. Count I alleged breach of fiduciary duty against Jackson Despres, and Count IV sought dissolution of the LLC.[2] On July 16, 2004, the parties entered into a consent order (First Consent Order), which provided that Despres would purchase the Marshes' interest in the LLC in order to avoid dissolution. Nanci Despres was named as a Defendant in Count IV because of her ownership interest in the LLC. However, because the First Consent Order provided for Jackson Despres to purchase the Marshes' interests, no judgment will be entered against her.
The First Consent Order also required Despres to pay approximately $1.1 million to the Marshes as an advance on the judgment which would eventually be entered, and provided that the fair value determined by this Court would be no less than that amount. As subsequently modified, the consent orders provided other forms of security for payment including the deposit of funds in the Court Registry. (Consent Order, December *Page 6 
10, 2004.) After the First Consent Order was executed, Despres assumed responsibility for building and selling the remaining lots and the Marshes' participation effectively terminated.
The Court will first address the value of the Marsh's interest in the LLC (Count IV), and will then address whether they may recover on their breach of fiduciary duty claims (Count I).
 III Valuation of the Marsh's Interest in the LLC
The July 16, 2004 consent order stipulated that the provisions of G.L. 1956 § 7-1.2-1315,[3] entitled "Avoidance of dissolution by share buyout," (buyout statute) would apply to the present dispute.[4] That statute provides in pertinent part that
 "Whenever a petition for dissolution of a corporation is filed . . . one or more of its other shareholders may avoid the dissolution by filing . . . an election to purchase the shares owned by the petitioner at a price equal to their fair value. . . . If the parties are unable to reach an agreement as to the fair value of the shares, the court shall, upon the giving of a bond or other security sufficient to assure to the petitioner payment of the value of the shares, stay the proceeding and determine the value of the shares. . . as of the close of business on the day on which the petition for dissolution was filed." Section 7-1.2-1315.
The parties agreed that Jackson Despres would purchase the Marshes' membership interests, and that the date of valuation would be June 11, 2004 — the date the Marshes filed their complaint. Therefore, the Court's task is to determine the "fair value" of the Marsh interests in the LLC. *Page 7 
Before analyzing the valuation evidence, however, it is important to understand the purpose of the valuation. When a shareholder seeks dissolution, the non-petitioning shareholders may avoid dissolution of the corporation — or in this case, the limited liability company — by purchasing the shares of the petitioning party under the buyout statute. This often occurs when a controlling owner is accused by a minority owner of oppressive conduct, see Hendrick v. Hendrick, 755 A.2d 784, 790
(R.I. 2000), although dissolution may be sought for a variety of reasons, see § 7-1.2-1314(a)(1) (stating circumstances, such as deadlock or waste of corporate assets, under which a shareholder may seek a court-supervised liquidation and dissolution). Instead of engaging in costly litigation over whether dissolution is appropriate, the corporation's existence continues under the ownership of the purchasing party, and the petitioner no longer participates in the company's future successes and failures. See Moll, supra at 309.[5] From the petitioner's perspective, the buyout statute approximates a sale of the entire entity to a third party in an arms length transaction — he or she receives a pro rata share of the sale proceeds and may productively invest those proceeds elsewhere.
The valuation process is complicated by the fact that any approach, out of necessity, relies upon estimates, assumptions, and projections that involve a degree of speculation. See Estate of Snyder v. UnitedStates, 285 F.2d 857, 861 (4th Cir. 1961) (concluding that closely held stock can be valued only "after a discriminating consideration of all information bearing upon an enlightened prediction of the future");Turgeon v. Turgeon, 460 A.2d 1260, 1265 (Conn. 1983) (noting that valuation is a *Page 8 
prophecy as to the future which should be "based on an examination of the appropriate financial tea leaves").
The Court begins its analysis from the premise, which appears undisputed, that the Marshes are entitled to their pro rata share[6]
of the fair value of the LLC as a whole. See, e.g., Charland v. CountryView Golf Club, 588 A.2d 609, 613 (R.I. 1991) (rejecting an approach which would reduce share value due to minority and lack of marketability); Douglas K. Moll, Shareholder Oppression and "FairValue": Of Discounts, Dates, and Dastardly Deeds in the CloseCorporation, 54 Duke L.J. 293, 318 (2004) (advocating for an "enterprise value" approach, as opposed to one which determines the fair market value of individual shares, because those shares are affected by minority and marketability discounts).
The parties rely upon the competing testimony of various appraisers as evidence of value. The Marshes presented Howard J. Gordon, whose area of expertise is the valuation of businesses. (Tr. 406.) Despres presented the testimony of Leo J. DeLisi, who was similarly qualified.See Def's Ex. 9 (containing DeLisi's curriculum vitae).
Both appraisers seem to agree that the value of the LLC is the price at which the entity would be sold in a hypothetical transaction between a willing buyer and a willing seller, neither of whom are under any compulsion to act. (Tr. 429; Tr. 1107-08.) The requirement that neither party be under any compulsion to act is in accord with the view of our Supreme Court, which does not approve of a "liquidation value" approach to fair value. See Jeffrey v. American Screw Co., 98 R.I. 286, 292,201 A.2d 146, 150 (1964) (stating that the *Page 9 
 "real objective is to ascertain the actual worth of that which the dissenter loses because of his unwillingness to go along with the controlling stockholders. . . . [T]his is to be determined by assuming that the corporation will continue as a going concern — not that it is being liquidated. . . .");
see also Bogosian v. Woloohojian, 749 F. Supp. 396, 398 (D.R.I. 1990) (finding that the buyout statute "seeks to preserve the ongoing value of the corporation from the perils of a liquidation sale"). Of course, the purpose of this LLC is to "liquidate." After building homes on the real estate — the LLC's sole hard asset — the real estate would be sold and the profits distributed. This Court's approach to valuation will assume that the process of liquidation will be an orderly one, reflective of the usual manner of building out a subdivision, and not a forced or compelled sale.
The appraisers also testified that there are three basic approaches to valuing a business: (1) a market approach, in which sales of similar businesses are compared to the business being appraised;[7] (2) the income approach, which Gordon ultimately adopted, and (3) an asset-based approach, which DeLisi adopted. (Tr. 424-25, 1010). The parties hotly dispute the appropriate approach to valuation.
Under the Marshes income-based approach, the LLC is worth either $5,850,000 or $7,362,000, and the Marshes fifty percent interest is worth either $2,925,000 or $3,681,000.[8] Under the asset-based approach advocated by Despres, the LLC is worth $1,765,500 and the Marshes are entitled to $882,750. *Page 10 
 A. Income Approach to Valuation
Under the income (or earnings) approach, the LLC is viewed by a hypothetical buyer and seller as a going concern with expected cash flows arising from the construction and sale of the remaining house lots. (Tr. 502.) In choosing this approach, Gordon testified that at the date of valuation, the LLC was
 "an entity that was in the process of developing a residential subdivision in Cumberland, Rhode Island; and it had, up through that point in time, had built and sold four high-end residential homes; had two more that were under contract that would be sold within a two-month period of time after the valuation date. There was a contract already in place for both of those houses. It had four other houses under various stages of construction; so that that, at that point in time, ten of the twenty-seven available lots were in some phase or had either had been sold or in some process of being built and complete." (Tr. 413-14.)
He observed that the LLC was a "viable entity for developing this. This subdivision wasn't just a pipe dream." Id. at 414. Therefore, he concluded that the appropriate method for valuing the LLC "should be based on the cash flow that was anticipated to be generated by this business." Id. at 415.
Gordon then proceeded to analyze the projected cash flows of the subdivision, based upon projected sale prices less projected building costs, until the subdivision was completely built. Gordon's cost projections were based upon the historical costs realized by the LLC, increased by a fixed percentage in future years. (Tr. 531-32.) He then calculated the present value[9] of the cash flows from 2004 to 2008, plus cash on hand, less *Page 11 
the value of any liabilities presently on the books of the LLC, in order to reach his estimate of fair value. (Pl's Ex. 39, Sch. 6, 7).
Despres criticizes Gordon for not analyzing the market for home-builders when preparing his fair value estimate. See Tr. 433-35 (containing Gordon's testimony that he utilized records of SPC and MBI to project future costs). Despres relies on the testimony of DeLisi that the LLC's historical costs must be adjusted to market costs. (Tr. 1034-36.) Because Gordon did not make such adjustments, Despres argues that the LLC's projected future costs were understated. Consequently, the fair value of the LLC would be erroneously high. Gordon himself recognized the potential for the unique arrangements found in a closely-held entity to affect a company's financial data. He wrote in a 1979 article that the "value of a closely-held company is influenced by excessive or low salaries, unusual prerequisites, and other special financial arrangements with company owners. Failure to make operating statement adjustments for these situations can lead to an improper value." (Tr. 519-20). Likewise, this Court is persuaded that the LLC's historical building costs did not necessarily represent market costs at the valuation date. See, e.g., Def's Ex. C (containing fax from Anne Marsh which represents, inter alia, that MBI's requested builder's fee is "less than [the] going rate").
Gordon's analysis suffers from its assumption that the LLC would continue constructing homes in the future in the same manner as it had in the past. (Tr. 415.) In order to complete the subdivision and profit from the LLC, a hypothetical buyer of the LLC would have to arrange some means for home construction — either by self-performing the work, or by contracting for the work. That buyer's cost estimates would *Page 12 
significantly affect the price that a buyer would pay for the LLC. Since the LLC had already terminated its building contract with MBI on of the valuation date, the buyer would have to make other arrangements for building and could not rely upon the former arrangement with MBI. (Pl's Ex. 22.) Even if the contract was not terminated, the contract only provided for the building of homes in exchange for a price "to be agreed upon." (Pl's Ex. 5.)
Therefore, reference to market rates on the valuation date is the proper way to project costs going forward, because new terms would need to be negotiated with a builder. If any income approach is to be used, it must rest on cost projections derived from the market on the valuation date, and not historical costs. The Marshes did not present evidence of such costs; but even if they had, DeLisi correctly notes that deriving such costs is a very speculative enterprise. (Tr. 1039.)
 B. Net Asset Approach to Valuation
At the date of valuation, the LLC's major assets consisted only of real estate and approximately $600,000 in cash. That real estate had all necessary permits and approvals, and the roads were substantially complete. However, the LLC had no equipment, employees, or any means to complete the construction other than money and any effort supplied by its owners. Because of these attributes, DeLisi concluded that an asset-based approach more accurately reflected the fair value of the LLC. (Tr. 1008-09.)
DeLisi utilized a real estate appraiser, Peter Scotti, whose appraisal became the cornerstone of DeLisi's valuation. Scotti's task was to value the 21 lots in the *Page 13 
subdivision which had yet to be sold.[10] Of those remaining lots, seventeen were unimproved, three contained partially completed buildings, and one lot had only a foundation in place. Scotti valued the real estate by determining the value of each lot, including the improved parcels; estimating how long it would take the market to absorb the twenty-one properties; accounting for the costs of holding and selling the properties over that period of time; and discounting future cash flows to present value. (Tr. 888; Def's Ex. N.)[11]
Scotti acknowledged that his approach "includes elements of" an income-based approach because it involved discounting future cash flows to present value. (Tr. 889.) The fundamental difference between his approach and Gordon's approach, however, is that Scotti's approach is based upon the market value of unimproved lots, while Gordon's approach is based upon the projected cash flow to the LLC. As a result, Scotti's approach generally does not require an assessment of building costs. Instead, he needed only to ascertain from the marketplace the retail value of a buildable house lot, which he found to be $180,000. (Tr. 890.) This estimate then formed the basis of his valuation of the LLC's real estate assets, which he found to be worth $2,800,000.
DeLisi incorporated the real estate appraisal into his net asset valuation of the LLC. (Def's Ex. P). After accounting for cash on hand, certain loans due, and various other assets and liabilities, DeLisi arrived at $3,130,000 as the amount of equity in the LLC. However, he then subtracted approximately $1.3 million to account for the *Page 14 
liabilities awarded in arbitration, which were unliquidated on the valuation date. Therefore, he found the fair value to be $1,765,500, and that the Marshes' share was $882,750.
 C. Comparison of the Competing Valuation Approaches
Despite the speculative nature of income approach, it would be appropriate and necessary if a business was expected to have intangible value — i.e., value above and beyond net asset value. (Tr. 1137-38.) Operating companies typically do have such value above and beyond the market value of their individual assets — as the saying goes, the whole is greater than the sum of its parts. For example, an established manufacturer might have equipment, inventory, and real estate which are valued at $1 million as separate assets. If that company was sold as a going concern, however, a buyer might be willing to pay a premium above net asset value because of the customer and employee relationships that have been established — i.e., goodwill. See Tr. 1086, 1093 (containing DeLisi's testimony that goodwill arises from established relationships and reputation, and that going concern value was defined as "[v]alue in continued use as a mass assemblage of income producing assets"); Tr. 129, Nov. 20, 2006 (containing similar testimony). A buyer would likely calculate the amount of such a premium based on an income approach. The historical earnings of the company may indicate cash flow which, after discounting for present value, may be worth, say, $1.5 million. If so, that extra $0.5 million is denominated as the intangible value of the company.
The Marshes argue that the LLC is an appropriate case for an income approach because it has intangible value. Therefore, a net asset approach would understate the value of the company. However, the Court does not consider this LLC to be the type of *Page 15 
business expected to have intangible value. A buyer of the LLC would not perceive the LLC as the "mass assemblage" of assets which characterize a going concern. On a forward-looking basis, the prior relationship that comprised the LLC — specifically the MBI building contract — would not reflect the situation that the buyer would be purchasing. Nor does the LLC have any employees or a contractor's license which would cause a buyer to pay something more for the LLC than the net value of its assets. In fact, the LLC only really possesses real estate assets and whatever the buyer adds to the LLC. Therefore, the Court declines to adopt Gordon's income-based analysis, or any such analysis, and will look to the net asset value of the LLC.
The Marshes object to Scotti's use of unimproved house lots as the basis for his real estate valuation because the LLC was never in the business of selling unimproved lots. However, these individual lot sales are the best evidence of the market's expectations of the eventual retail price of a home, and the costs to build that home, both of which are reflected in the individual lot value. Therefore, they represent how the market would allocate the benefits accruing to sellers/landowners, and to buyers/builders of undeveloped lots. See Lataille, 109 R.I. 75,78, 79, 280 A.2d 98, 100 (R.I. 1971) (noting that comparable sales "when made under normal and fair conditions, are necessarily a better test of the market value than the speculative opinions of witnesses; for truly, here is where `money talks.'") (citations omitted).
For example, if the home is expected to retail for $700,000, and it will cost $400,000 to build and market that home, then there would be $300,000 available for division between the seller/landowner and buyer/builder.[12] The owner could have kept that entire $300,000 by building the home itself — a situation analogous to one where the *Page 16 
Marshes remain members of the LLC. However, in a sale situation, that $300,000 benefit will be divided in some fashion with the builder/buyer. The benefit to the seller will be the sale price of the undeveloped lot. The benefit to the builder/buyer will be the profit realized when the home is sold at retail, less the sale price and the costs of construction.
In this case, where the LLC's assets consist mostly of undeveloped lots, the Marshes' status as part owners of the LLC puts them in the position of the seller. In such a sale, they would realize some benefit as owners, but would not realize the entire added value of building a home, because they would not own the lots when they are built and will not participate in that development. To replicate a market-based sale of the LLC, therefore, it is sensible to derive the price of the LLC from the value of unimproved lots, even if the LLC had planned to develop them.
Scotti's approach is to observe transactions of individual, unimproved lots occurring in the marketplace. Adjustments are then made to account for the fact that multiple lots are at issue, and that the lots are at various stages of completion. Gordon's approach would attempt to quantify the eventual retail price, and the costs to build, for the entire subdivision in order to find fair value.
Gordon utilized historical costs of the LLC to estimate costs, and the Court does not find those costs to be an accurate predictor of the future costs to a buyer. However, even if Gordon had estimated market costs, it would be very difficult to ascertain such costs with certainty, translate those costs into accurate cash flow projections four years into the future, and derive a fair value of the LLC. Every step in his analysis contains assumptions and estimates on which reasonable persons may differ, and these choices can produce wide variations in the ultimate value reached. Looking to values of individual *Page 17 
lots is a more accurate way to ascertain the fair value of the LLC — whose only hard assets are individual lots of real estate — than by attempting to estimate retail prices and construction costs.
 D. Application of Asset-Based Method
Although the Court finds that the DeLisi/Scotti conceptual approach was more appropriate, it does not necessarily follow that the conclusions of value are sound. Therefore, the Court will analyze the various assumptions which led to DeLisi's opinion that the fair value of the LLC is $1,765,500.
The Marshes have criticized Scotti's appraisal for several reasons: the use of $180,000 as the base lot value (Tr. 890-91); the "absorption" analysis which spreads lot sales out over three years, and the resultant discount for present value (Tr. 892); and his use of a 15% "entrepreneurial profit" deduction for the undeveloped lots (Tr. 900). The effect of each decision reduces the overall real estate value by significant amounts. The Marshes dispute these decisions, relying on the testimony of Webster Collins, who performed a "review appraisal" on Scotti's work. See Tr. 59-60, 128, Nov. 20, 2006 (defining review appraisal).
Scotti first concluded that unimproved, buildable lots retail for $180,000 based upon comparable lot sales in the area. (Tr. 890-91; 939-41.) This figure was the starting point for his analysis of the eighteen unimproved lots owned by the LLC.[13] However, Collins points out that most of Scotti's comparable lots were sales occurring in 2003 or late 2004. (Tr. 67-68, Nov. 20, 2006.) He suggests that the real estate market was rapidly appreciating prior to the valuation date, so that comparable sales which are closer *Page 18 
to the valuation date would more accurately reflect individual lot values. Id. at 67-68, 70. His appraisal used comparable lots which were sold, or put under agreement for sale, within one or two months before or after the sale. Id. at 67-68, 84-86. Therefore, he concluded that $225,000 per unimproved lot was more accurate. Id. at 88. The difference between the two approaches — $45,000 per lot times eighteen lots — is $810,000 before accounting for present value.[14]
Scotti's absorption analysis represents an assumption that the hypothetical buyer of the LLC could not sell all of the lots immediately. He posits that a buyer would take three years to sell every lot. Therefore, he includes 10 percent annual appreciation for lot prices in his analysis, but also discounts the cash flows received in future years by a 12 percent discount rate. (Ex. N; Tr. 893-95.) He also includes three years of real estate taxes and related costs of holding the lots over that time period. This has a net effect of reducing the indicated value of the property — the value that a buyer would be willing to pay. (Tr. 942-43.) Collins rejected any absorption analysis, concluding that a buyer of the LLC's real estate assets would not require three years to market and sell each lot. (Tr. 100-107, Nov. 20, 2006.) Rather, he opined that the LLC could sell the lots within six months of the valuation date by packaging the lots in 5 to 6 lot groups.See id. While a 10 percent bulk discount would be appropriate, as well as an allowance for sales commissions, Collins rejected Scotti's absorption assumptions. Id. at 77-78, 81, 90.
The last disputed adjustment is the 15 percent "entrepreneurial profit" item added as an expense to the real estate valuation. (Tr. 900-01.) This had the effect of eliminating $812,820 from the project cash flows, and reduced the real estate value by *Page 19 
approximately $680,000.[15] (Def's Ex. N.) Scotti justified this discount because development, "especially residential development, is not for the faint of heart. In order to — for someone to come in and put up two-six, two-eight, you know, that much money, they need a good incentive to make some money on it." (Tr. 901.) By allowing for a ten percent bulk discount, Collins seems to agree — he just disagrees with the magnitude of all of Scotti's adjustments. Collins noted that, after aggregating the individual lot values, "you have to take a discount for bulk and you have to have some sale commission. And when I did that, I was in at [$4.865 million] which is a 15 percent discount. In contrast, Scotti's discount was 50 percent." (Tr. 81, Nov. 20, 2006.)
The Court finds that, in general, Collins' criticisms of Scotti's appraisal are well taken. Scotti undertook a "development approach" which attempts to project the costs of completing a subdivision. (Tr. 888.) He concludes that no buyer would pay more than $2.8 million for the land, because in light of the expected costs of the subdivision, the buyer could not profit if he paid more than that amount. These expected costs included site development, administrative overhead costs to the entity, legal costs such as sales agreements and title work, and marketing costs. (Tr. 895-99.) However, at this stage in the development process, most of the costs and risks of development have already been incurred. The lots are buildable lots that could be sold on the market immediately. (Tr. 76, Nov. 20, 2006.) Therefore, Scotti's cost deductions, especially the entrepreneurial profit adjustments, were excessive and do not reflect a market-based sale of the LLC.[16] *Page 20 
As the following illustration suggests, no seller would sell the real estate for the value that Scotti derived unless he was under some compulsion to act.
Scotti began his real estate appraisal by valuing the three lots that contained building structures. (Tr. 890.) He estimated that they would sell in the first year following the valuation date for a combined sum of approximately $2.2 million.[17] He estimated a cost to complete construction of $550,000. (Def's Ex. N.) He subtracted a 5 percent profit factor ($143,940) for the three lots in order to induce a buyer to assume the risk and responsibility of developing and selling those lots. See id.; Tr. 900. Finally, he deducted a fifteen percent overall "entrepreneurial profit" on every lot — $326,700 of which is allocable to these three lots.[18] Therefore, cash flows from these three properties would be approximately $1,157,360 in the first year — $1,033,357 when reduced to present value.[19] Therefore, Scotti has allocated approximately $1,033,357 of value to these three lots, leaving roughly $1,766,643 of value allocable to the other eighteen lots or $98,146 per lot.
The Court believes that some discount is appropriate because the lots are being sold in bulk, and a buyer would seek a multiple-lot discount. (Tr. 81, 90, Nov. 20, 2006.) However, even assuming arguendo that an undeveloped lot is worth only $180,000, as Scotti opined, the Court questions whether any seller would willingly agree to a price which includes discounts averaging approximately $80,000 per unimproved lot — *Page 21 
although certainly a buyer would gladly accept such terms. Id. at 80. The buyer of the LLC could then turn around and sell each lot for $180,000, or develop the lots and realize a builder's profit as well. In either case, however, the seller would be foregoing a great deal of revenue by selling at $2.8 million. See id. at 76, 81.
For these reasons, the Court finds that Collins' opinion of the LLC's real estate assets was more credible, and will adopt it for purposes of valuing the LLC. Therefore, the Court will substitute a new real estate valuation of $4,865,000 into table IV-2 of Defendant's Exhibit P, in place of the $2,800,000 figure derived from Scotti's appraisal. (Tr. 92, Nov. 20, 2006.)
DeLisi's net asset valuation is otherwise sound. The substituted real estate appraisal results in a new value of $5,195,000 prior to accounting for the arbitration awards. After subtracting $1,364,676 for these awards, the value of the LLC was $3,830,324 on the valuation date. One half of this amount is $1,915,162 which represents the fair value of the Marshes collective 50% interest in the LLC.
 III Breach of Fiduciary Duty
The Marshes allege that the following acts constitute a breach of Jackson Despres' fiduciary duty to the Marshes and to the LLC:[20] (1) demanding a greater payment on behalf of SPC than it was entitled under its road building contract; (2) filing the mechanic's lien against the LLC's real estate and, therefore, causing a default on its financing with Citizens Bank; (3) terminating SPC's work on the subdivision in May/June 2004; (4) refusing to pay MBI's subcontractors after April 2004; (5) *Page 22 
improperly terminating MBI's building contract. The Marshes contend that this series of acts was motivated only by self-interest, and constituted a "freeze-out" by defeating their reasonable expectations in investing their capital in the LLC. See, e.g., Hendrick v. Hendrick, 755 A.2d 784,791 (R.I. 2000) (noting a trend in recent judicial decisions which measures oppressive conduct based on the effect on the aggrieved shareholder's reasonable expectations in investing in a close corporation).
The Court finds that certain of Despres' actions did amount to an oppressive "freeze out" of the Marshes which justified their decision to seek dissolution of the LLC.[21] The Court further finds that the conduct constitutes a breach of fiduciary duty to the LLC, and to the Marshes as members of the LLC. There was simply no reason to cause a mechanic's lien to attach to the LLC's assets, or to withhold payments from MBI's subcontractors, except that those actions made it very difficult for the Marshes to continue construction. Despres controlled the LLC checkbook, and knew that its assets were sufficient to cover most, if not quite all, of his alleged claims. Moreover, the termination of the MBI building contract deprived the Marshes of their expectation to realize a benefit from the business of the LLC in the form of reasonable builders' fees to their company, MBI.
 A. Lost Profits Damages
As evidence of damages, the Marshes have presented a "lost profits" analysis that calculates the profits which the Marshes would have realized had they remained members of the LLC through completion of the 27 homes. They point to the fact that Despres has *Page 23 
been operating the LLC for several years now, and has received all of the profits to which the Marshes otherwise would have been entitled. Since the Marshes feel that they were expelled from the LLC in an unfair manner, they seek to participate in the profits which they would have enjoyed as members.
The Marshes contend that "but for" Jackson Despres' breaches, they would have remained members and participated in the profits of the LLC.[22] That is not entirely true, however. Even in light of those actions, they still remained members of the LLC for a short time. It was only upon their decision to pursue dissolution, and their consent to application of the buyout statute, that their membership interests terminated. The situation is not altogether different than if the Marshes had simply accepted an offer to purchase their shares. In that case, they would be entitled only to the purchase price whether or not the LLC realized future profits, and regardless of their reasons for selling their interests. Similarly, by pursuing dissolution and consenting to the buyout statute's applicability, they are now entitled only to the "fair value" contemplated by the buyout statute and not a future profits award.
The buyout statute contemplates a streamlined manner for an aggrieved owner to withdraw its capital from the LLC, while avoiding dissolution.See Moll, supra at 369 370 (noting that the statute seeks to avoid expensive litigation over whether or not oppression has occurred). The purchase of the Marshes interests at the June 11, 2004 value under that statute compensates the Marshes for their lost investment opportunity. Once the Marshes are paid the fair value of their interests, they have the ability to *Page 24 
reinvest their capital in whatever manner they choose. They can invest that capital elsewhere, presumably in an investment with expected risks and returns that are similar to the LLC, and will be put in essentially the same financial position had they remained members, less any litigation and transaction costs. Therefore, they are fairly compensated for the investment opportunity in the LLC which they have "unwillingly surrendered." See Moll, supra, 54 Duke L.J. at 322.[23] As of the valuation date — agreed by the parties to be controlling — Jackson and Nanci Despres became the only owners of the LLC under the buyout statute. Therefore, they are the only two individuals who must bear the future risks arising from ownership of the LLC. The Marshes will make their profit by reinvesting their capital elsewhere.
Potential profitability is a factor incorporated in the fair value of the LLC. To the extent that future gains are expected from membership in the LLC, the value of the LLC will be enhanced and the Marshes will receive a greater amount. However, a lost profits award based upon the duration of the LLC's lifespan would confer a double recovery on the Marshes at the expense of Despres. Despres is required to pay fair value for the Marshes' interests, but once he does so, he is entitled to keep any and all profits arising from ownership of those interests. Therefore, the Marshes are not entitled to an award of lost profits in addition to payment of "fair value."
 B. Other Damages
Although the available damages are limited by the valuation date, it is still possible for the Marshes to recover for a breach of fiduciary duty while at the same time *Page 25 
utilizing the buyout statute. In its August 31, 2006 ruling, denying the Despres' motion for summary judgment on the breach of fiduciary duty claim, this Court excused the Marshes' neglect of the pleading requirements of a derivative action. The Court found that the Marshes' claims were derivative in nature, at least partially, but allowed the Marshes to proceed with their claims as a direct action against Jackson Despres. This Court found that
 "[i]f a favorable judgment is rendered on the claims in Count I, it will enhance the value of the Marshes' interest in the LLC and be reflected in the amount to be paid them pursuant to the terms of the Consent Order. (For example, if the total value of the breach of fiduciary duty claim is $100,000, the Marshes' interest would be $50,000 or half that amount. . . which would be paid to them as an enhancement to the value of their share of the LLC." Marsh, 2006 R.I. Super. LEXIS 119 *30 n. 3.
Because the Marshes were bringing claims which were at least partially derivative claims, while at the same time obtaining payment from Jackson Despres for their ownership interest in the LLC, it made sense to permit the Marshes to treat any derivative claim against Jackson Despres as a direct claim.
The Court's ruling recognized the fact that the fair value received for the Marshes shares may under-compensate them, because the allegations of oppressive conduct predate the valuation date by several months.[24] To the extent that the alleged breaches caused damages[25] to the LLC prior to the valuation date, the Marshes could then recover *Page 26 
their pro rata share directly from Jackson Despres. However, the proper measure of such damages is only those damages which occurred prior to the valuation date, since their ownership interests are deemed to terminate on that date.
While it may be that the LLC was devalued prior to June 11, 2004 as a result of Despres' breaches of fiduciary duty, the Court finds little evidence upon which to base such an award. The Marshes rely exclusively upon the lost profits analysis which, as described above, is not an appropriate measure of damages. They have not presented any evidence that the LLC was devalued by the mechanic's lien filing; the failure to pay MBI subcontractors; or any of the issues surrounding SPC's road building contracts. Therefore, the Court will not award any damages arising from these breaches.
However, DeLisi properly subtracted an arbitration award from the value of the LLC on the valuation date, and the Court has adopted that aspect of his analysis. (Def's Ex. P, Table V-1.) The Arbitrator found that
 "the parties to the house-building contract had a duty to act in good-faith to reach an agreed-upon contract price for each home. . . .MBI makes a claim for `lost profits,' but really, its claims is [sic] for the lost construction fees that it would have earned on the remaining lots." (Arbitration Award 25-26.)
He then awarded $472,689 to MBI, which included lost profits on the remaining lots after adjusting for MBI's duty to mitigate damages.Id. at 28-29. The Arbitrator also awarded prejudgment interest on this award. Id. at 31. Therefore, because Jackson Despres terminated the MBI contract, the LLC has paid a builders' fee on lots which were not actually built, and the LLC received no benefit from that lost profits award.
The Court finds that this arbitration award is a direct result of a breach of fiduciary duty owed by Jackson Despres to the LLC, and that the breach devalued the *Page 27 
Marshes' interest in the LLC. Therefore, the, as of the Court will award damages of $236,344.50 to the Marshes, representing one-half of the arbitration award for the lost profits of MBI.
 C. Counterclaims Against the Marshes
Despres makes passing reference in his post-trial brief to a counter-claim against the Marshes. He alleges that the Marshes violated the operating agreement, in violation of their fiduciary duties, by petitioning for dissolution. Therefore, he seeks $478,500 in damages which represents statutory interest of twelve percent annually for the $1.65 million that Despres deposited in the Registry of the Superior Court during the pendency of this action. However, the First Consent Order specifically provides that the deposited amount shall accrue interest, and any amounts not necessary to satisfy the judgment in this case will be returned to Despres. Therefore, he has not suffered any damages from the posting of security, and his counterclaim is without merit. Judgment shall enter against Despres on his counterclaims(s).
 IV Conclusion
After due consideration of the evidence and testimony presented at trial, as well as the arguments advanced by counsel at oral argument and in their memoranda, the Court finds that Peter Marsh is entitled to a judgment of $957,581 against Jackson Despres on Count IV as fair value for the purchase of his membership interest in the LLC. Similarly, the Court finds that Anne Marsh is also entitled to a judgment of $957,581 against Jackson Despres on Count IV. Peter and Anne Marsh are each entitled to judgment against Jackson Despres on Count I of their complaint for breach of fiduciary duty, in the *Page 28 
amount of $118,172.25 each. Prejudgment interest may be added to each of these judgments consistent with the consent orders previously entered and G.L. 1956 § 9-21-10. Judgment shall enter against Jackson Despres on his counterclaim(s).
Counsel for the Marshes may prepare an appropriate order and judgment, which shall take into account any amounts already paid or presently held in escrow, and which shall be settled after due notice to counsel for the Defendants.
[1] Unless otherwise stated, references to "Despres" means Jackson Despres in this decision.
[2] Counts I and IV apply only to Plaintiffs Peter and Anne Marsh. Counts II and III of the Plaintiffs' complaint were submitted to binding arbitration, as well as claims made by SPC and the Despres'. These claims involved the alleged breach of two contracts: one between MBI and the LLC for building the homes, and one between SPC and the LLC for building roads and utilities. These claims were resolved by the arbitrator, and a final judgment was entered on those claims pursuant to Rule 54(b).
This Court originally had stayed the trial on Counts I and IV pending an appeal of the judgment on Counts II and III. The Supreme Court has since entered an order vacating the stay on Counts I and IV, allowing the trial which is the subject of this decision to proceed. That order also stayed the effect of the judgment on Counts II and III and held the appeal in abeyance pending resolution of all claims in Superior Court.
[3] The consent order actually refers to the predecessor of §7-1.2-1315, which is substantially similar and was formerly found at G.L. 1956 § 7-1.1-90.1 (repealed by Pub.L. 2004, ch. 216, § 1, and Pub.L. 2004, ch. 274, § 1).
[4] There was a dispute as to whether the buyout statute was applicable to the LLC, since it appears in the Rhode Island Business Corporations Act. However, since the parties have stipulated to application of the buyout statute, this Court need not decide whether it would have been applicable otherwise.
[5] The buyout statute usually serves to avoid significant expenditures of resources on litigation. Because the buyout election "often occurs before a court has made a finding of oppression, the election statutes, in most instances, effectively create a no-fault `divorce' procedure. The company at issue continues as a going concern under the control of the majority shareholder, the allegedly aggrieved investor is cashed out of the business, and no finding of wrongdoing is made by the court." Moll, supra at 369-370.
[6] The Court's will generally refer to the Marshes' pro rata share as 50%, although it would be more accurate to state that Peter and Anne Marsh are each separately entitled to 25%. The judgment in this case will reflect their individual shares.
[7] Our Supreme Court has stated in an eminent domain context that, when valuing real estate, an analysis of comparable sales is the preferred method. Lataille v. Housing Auth., 109 R.I. 75, 78, 79,280 A.2d 98, 100 (R.I. 1971) (noting that "[s]uch sales, when made under normal and fair conditions, are necessarily a better test of the market value than the speculative opinions of witnesses; for truly, here is where `money talks.'") (citations omitted). Neither witness adopted a market-based approach, however, because neither could find evidence of transactions involving businesses similar enough to form an appropriate basis for comparison. (Tr. 425, 1010-13.)
[8] The Marshes advance two values as their proposed fair value, and ask the Court to determine which is appropriate. Mathematically, the difference between the two values is the discount rate used to reducefuture cash flows to present value. See Pl's Ex. 39, Sch. 6, 7. The Court will address the appropriate rate below if necessary.
[9] Present value is a concept that takes into account the "time value of money." Receiving a dollar now is more valuable than receiving a dollar one year from now, in part because that dollar can be invested and can earn a return during that time. Therefore, the prospect of receiving a given amount of money in the future must be adjusted to its present value.
[10] The LLC set out to develop 27 lots. On the valuation date, four of the lots had been developed and sold outright. Two other lots were under contract for sale on the valuation date. Since their retail price was fixed by contract, and the remaining construction costs were minimal and reasonably predictable, DeLisi did not require the services of an appraiser for these two lots. (Tr. 1051-52.) Therefore, Scotti's appraisal focused on the remaining 21 lots.
[11] For the partially completed homes, Scotti estimated the retail value of a completed home, less the costs to complete construction, in order to value these parcels. For the lot with only a foundation, he added $20,000 to the base value of an unimproved lot.
[12] Scotti testified that the most likely buyer is a home builder. (Tr. 889-90.)
[13] Scotti and Collins both added $20,000 in value for the lot with an existing foundation. (Tr. 890; Tr. 89, Nov. 20, 2006.)
[14] Despres argues that Collins' comparable sales are inappropriate because they occurred after the valuation date. However, even Scotti testified that sales occurring slightly after June 11, 2004 are competent indicators of the market on that date. (Tr. 961.)
[15] The entrepreneurial profit adjustment reduced projected cash flows by $461,820 in year 1; $216,000 in year 2; and $135,000 in year 3. By multiplying these amounts by the present value factors stated in Defendants' Exhibit N — approximately 0.89, 0.80, and 0.71 for each of the respective years — this adjustment reduced Scotti's valuation estimate by approximately $680,000.
[16] Moreover, Scotti made a $200,000 adjustment to land value for the remaining road costs and site development work. (Tr. 895; Def's Ex. N.) However, many of these costs were also included in the arbitration award, which DeLisi subtracted from the LLC value. This is an additional reason for rejecting Scotti's opinion of the real estate value.
[17] This value can be derived by noting that the first year revenue figure includes five lots at $180,000 per lot. By subtracting $900,000 from the first year revenue stated in Exhibit N, it follows that the three partially completed homes represent cash flow of $2,178,000.
[18] Fifteen percent of $2,178,000 is $326,700.
[19] The present value figure is reached, using a 12 percent discount rate, by multiplying the cash flow figure by 0.8928571 (1/1.12) as shown in Exhibit N, Year 1. For purposes of this illustration, the Court has ignored as negligible the other costs listed in Exhibit N — such as marketing costs, taxes, etc. — which might be allocable to these three lots.
[20] The Court found in its earlier decision that, not only do managers of an LLC have fiduciary duties to the LLC, but that members of this LLC also owed each other a duty of "utmost care, loyalty, and good faith" similar to that owed by shareholders in a close corporation.Marsh, 2006 R.I. Super. LEXIS 119, *12-*15.
[21] Although Despres contends that the Operating Agreement disallows filing a petition for dissolution, see Pl's Ex. 3 ¶ 9.10, Despres waived any objection by stipulating to the buyout statute's application and agreeing to purchase the Marshes' interests.
[22] Thomas Westgate, a certified public accountant, was retained by the Marshes "to determine the benefits that would have accrued to the LLC and then to the Marshes had the breach in contract not occurred." (Tr. 715:6-8.) He "assumed that the business would continue as it had been the practice prior to the events complained of in the case."Id. at 715:20-23.
[23] The consent orders required Despres to pay $1.1 million to the Marshes in 2004, to post various forms of security including interest-bearing escrow accounts, and to pay prejudgment interest on the remaining sums owed. Therefore, the Marshes will receive the June 11, 2004 fair value and also be compensated for the delay in receiving full payment.
[24] The Marshes have identified March 15, 2004 as the date upon which prejudgment interest should run on their breach of fiduciary duty claim. This is the date that Jackson Despres gave the Marshes his "random thoughts" memorandum containing his grievances. (Pl's Ex. 16A.) Therefore, they contend that the oppressive conduct began no later than March 15, 2004, some three months before filing for dissolution.
[25] Damages may be calculated by measuring a plaintiffs' loss resulting from the breach. Lawton v. Nyman, 327 F.3d 30, 42-43 (1st Cir. 2003). In this case, if the LLC lost any value prior to the valuation date, the Marshes would be entitled to damages for their share of the lost value. Alternatively, damages may be measured by causing the breaching party to disgorge any unjust enrichment gained from improper self dealing, misappropriation, or waste of corporate assets. Seeid. *Page 1